UNITED STATES of America

v.

Wilbert S. BRODIE, a/k/a Dubby Brodie, Appellant.

No. 88-3076.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 9, 1989.

Decided March 21, 1989.

See also, D.C., 686 F.Supp. 941.

David B. Smith, Washington, D.C. (appointed by the court), for appellant.

Susan B. Dohrmann, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell and Helen M. Bollwerk,

Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before RUTH BADER GINSBURG, SILBERMAN and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Following a jury trial in district court, appellant Wilbert S. "Dubby" Brodie was found guilty of two counts of selling cocaine to an agent of the Drug Enforcement Administration (DEA) in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii). On appeal, Brodie contends that the district court erred in refusing to conduct an evidentiary hearing on the issue of whether the Government should have been required to disclose the identity of the informant who, among other things, introduced Brodie to the DEA agent. Brodie argues that the Government should also have been ordered under Rule 16(a)(1)(A), FED.R. CRIM.P., to produce the tape and transcript of a secretly-recorded conversation between him and the informant, and that the failure to produce this recording prejudiced Brodie's substantial rights. We find no merit in the first contention—the district court did not abuse its discretion in declining to order disclosure of the informant's identity. We do think Brodie was entitled (if not to the tape) to a printed transcript of the conversation he requested. Nevertheless, we do not believe he was prejudiced substantially by the district court's failure to order its production. Moreover, we find no plain error in the district court's having permitted the Government to use the withheld recording at trial. We therefore affirm.

I.

Early in the fall of 1987, the DEA learned that appellant was involved in cocaine trafficking, and soon thereafter engaged the services of an informant to purchase from Brodie a small amount of the drug. On October 5, the enlisted informant, who was wearing a recording device, successfully negotiated the purchase of one ounce of cocaine from Brodie, and indicated that he had an acquaintance who was interested in much larger buys. Brodie expressed interest and a short time later the informant introduced Brodie to his acquaintance, who turned out to be Special Agent Livia Adams working undercover for DEA. Special Agent Adams bought three ounces of cocaine from Brodie at this introductory meeting and told Brodie she wanted to make further purchases on a regular basis for distribution in New York. Thereafter, two more transactions were arranged between Adams and Brodie directly, without the participation or observation of the informant. At the conclusion of the last buy—involving one kilogram of cocaine—Brodie was arrested and charged.

The grand jury subsequently returned an indictment charging Brodie with all four cocaine sales. Prior to trial, Brodie requested production of both the informant's identity and the tape of the October 5 exchange between himself and the informant. Discovery of this information, according to Brodie, was relevant to a potential defense of entrapment. Brodie argued that it would be necessary to interview the informant not only because the informant was a party to the sale identified in count one of the indictment and a witness to the second sale, but also because of the informant's continued encouragement of Brodie's criminal activity with Special Agent Adams. As to the October 5 tape recording, Brodie asserted that the tape was presumptively discoverable under FED.R.CRIM.P. 16(a)(1)(A) as a "relevant ... recorded statement[ ] made by the defendant ... within the custody or control of the government." FED.R.CRIM.P. 16(a). Conceding that the tape fell within the ambit of Rule 16, the Government nevertheless resisted both motions, citing its privilege to prevent discovery of the informant's identity. *See Roviaro v. United States*, 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957). In a memorandum filed with the district court, Government counsel contended that disclosure of the informant's name would "expose him to danger in the violent drug community." And because the tape could

be used, through unspecified means of voice identification, to compromise the informant's identity, the Government argued that it must be protected from disclosure as well. To further bolster its position, the Government represented that it would accept dismissal of counts one and two of the original indictment—involving the sales in which the informant was either a witness or a participant—if the court concluded that disclosure of the informant's identity was not otherwise warranted.

After reviewing a transcript of the October 5 tape recording *in camera*, the trial judge concluded that "there [was] nothing in those tapes that would lend the slightest support to an entrapment defense." In companion rulings, he therefore denied Brodie's motion to produce the tape and ordered counts one and two of the indictment dismissed with prejudice. While the record does not reflect an explicit trial court ruling on Brodie's motion to discover the informant's identity, it seemed apparent to defense counsel that denial of the tape and denial of the informant's identity went hand in hand.

At trial, Special Agent Adams testified at length about the two remaining transactions with which Brodie was charged, saying nothing about the two earlier sales dropped from the indictment. On cross-examination, however, over the objection of Government counsel, Adams acknowledged the two prior sales and the facilitative role played by the DEA informant. At the conclusion of defense counsel's examination of Adams, and without a defense objection,[1] Government counsel elicited Adams' testimony as to both the existence and the contents of the as yet undisclosed October 5 tape recording of the first sale. In particular, Adams testified that she had listened to the recording as it was made and could recall nothing in the tape suggesting anything in the way of threatening remarks or pressure brought to bear on Brodie by the informant.

Brodie's sole defense was entrapment.[2] He took the stand and alleged that during the entire period covered by the indictment, he was acting as a reluctant agent of the informant. According to Brodie, the informant duped him into selling drugs by claiming that he had a sick daughter who required expensive medical attention, and that the informant's wholesale cocaine suppliers would not "front" him the drugs he needed to market in order to pay his daughter's medical bills. The informant allegedly explained that his suppliers would agree to front the drugs to Brodie, since he had a legitimate business (a small recording studio). Brodie claimed that the sales with which he was charged were made solely on behalf of the informant—not for Brodie's benefit—and that the informant periodically provided encouragement to Brodie to continue the criminal enterprise, at one point suggesting to Brodie that the informant's associates might harm him if he ceased selling cocaine.

The Government cross-examined Brodie extensively. At one point, relying on the tape and transcript shielded from discovery, Government counsel queried Brodie concerning statements he made to the informant during the October 5 sale suggesting, among other things, that Brodie was keenly aware of the subtleties and sophistication of the drug trade. Defense counsel was not heard to object, nevertheless, and the Government's use of the withheld transcript for impeachment purposes was allowed.

The jury returned verdicts of guilty on both counts of the indictment.

## II.

We first consider whether the district court erred in denying defendant's pretrial motion for discovery of the informant's identity without conducting an evidentiary hearing into the possible relevance and helpfulness of the informant's testimony to

---

1. In a colloquy at bench, defense counsel expressly stated that he had no objection to prosecution testimony concerning the existence of a wire recording.

2. At the conclusion of the trial, Brodie requested, and received, a jury instruction on coercion and duress as well.

Brodie. Under the circumstances, we do not believe the district court abused its discretion in refusing to inquire further into the informant's potential usefulness to the defendant.

■ The Government's time-honored privilege to withhold the identity of its informants from criminal defendants is supported by weighty considerations of law enforcement, but it is by no means absolute. One of the more basic limitations on the scope of the privilege was recognized by the Supreme Court in *Roviaro:* "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of the cause, the privilege must give way." *Roviaro,* 353 U.S. at 60–61, 77 S.Ct. at 628. As such, the Government's mere assertion of a colorable claim of privilege does not end the trial court's inquiry, for the court must determine whether the potential helpfulness of informant's testimony to the defendant warrants a conclusion that the defendant cannot be tried fairly absent disclosure. *Id.; see United States v. Yunis,* 867 F.2d 617, 623–24 (D.C.Cir.1989).

■ In the instant case, Brodie's request for the informant's identity was filed when the two drug sales in which the informant had participated were still a part of the case. Since the informant was the sole witness to one of the transactions, and the sole non-Government witness to the other, Brodie's claim for discovery at that point in the proceeding seemed especially strong. *See Roviaro,* 353 U.S. at 64, 77 S.Ct. at 629; *United States v. Barnes,* 486 F.2d 776, 779–80 (8th Cir.1973); *United States v. Roberts,* 388 F.2d 646, 648–49 (2d Cir.), appeal after remand 401 F.2d 538, *cert. denied,* 393 U.S. 1005, 89 S.Ct. 496, 21 L.Ed.2d 469 (1968); *Gilmore v. United States,* 256 F.2d 565, 567 (5th Cir.1958). But dismissal of the first two counts of the indictment left Brodie's claim on a substantially different footing; all that remained before the trial judge to assess the potential helpfulness of the informant's testimony was Brodie's generalized assertion that the informant had encouraged him on a number of occasions to continue dealing drugs. Significantly, after dismissal of the first two counts became probable, defense counsel declined the trial court's invitation to elaborate on whether Brodie's need for the informant's testimony was enduring, stating merely that he had "nothing to add to that which [was] in the written pleading."

We do not believe the district court was obliged to inquire further before denying the defendant's motion to discover the informant's identity. The only concrete evidence before the court on the issue of potential entrapment—the October 5 tape and transcript—contained nary a suggestion of pressure or encouragement from the informant. While it is perhaps conceivable that the informant might have bolstered Brodie's entrapment defense in some way, we think it was reasonable for the district court to require more specific references from Brodie before ordering disclosure. Having been a party to all of the conversations in which the informant may have rendered encouragement, Brodie had the unquestioned capability of providing more specific information. *See United States v. Valenzuela–Bernal,* 458 U.S. 858, 874, 102 S.Ct. 3440, 3450, 73 L.Ed.2d 1193 (1982). Brodie failed to do so prior to trial, and therefore we think that the district court acted well within its discretion in refusing either to order disclosure or to conduct an evidentiary hearing.

### III.

■ There is little question that the tape and transcript of the October 5 conversation were within the ambit of FED.R.CRIM.P. 16(a)(1)(A) and therefore subject to compulsory disclosure to Brodie provided they did not fall within the scope of any applicable privilege. *See United States v. Bryant,* 439 F.2d 642 (D.C.Cir.1971); *United States v. Crisona,* 416 F.2d 107 (2d Cir.1969), *cert. denied,* 397 U.S. 961, 90 S.Ct. 993, 25 L.Ed. 2d 253 (1970); *Davis v. United States,* 413 F.2d 1226 (5th Cir.1969). The Government conceded at argument that the tape and transcript would have been discoverable by Brodie under Rule 16 but for its avowed

concern about disclosing the informant's identity, but the Government's concern in this regard seemed somewhat overblown. While disclosure of the tape may have enabled Brodie to discover the informant's identity, we do not see how a printed transcript could similarly have been used. "The scope of the [informant's] privilege is limited by its underlying purpose," and "where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged." *Roviaro*, 353 U.S. at 60, 77 S.Ct. at 627.

■ Had defense counsel filed a specific request for a printed transcript of the October 5 recording, we would have little doubt that the Government violated Rule 16(a)(1)(A) in failing to provide Brodie a copy. Nevertheless, even had counsel done so—or were we to construe his request as implicitly including an alternative request for the transcript alone—we would not find reversible error. Our review of the transcript, which contains nothing remotely exculpatory or supportive of a potential line of defense for Brodie, convinces us that Brodie was not prejudiced by its denial. Because a defendant must show prejudice to substantial rights to gain reversal for a violation of Rule 16, *see United States v. Pelton*, 578 F.2d 701, 707 (8th Cir.), *cert. denied*, 439 U.S. 964, 99 S.Ct. 451, 58 L.Ed. 2d 422 (1978); *United States v. Caldwell*, 543 F.2d 1333, 1352–53 (D.C.Cir.1974), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), we see no basis in the denial of the transcript for upsetting Brodie's conviction.

■ Whether the recording of the October 5 exchange was properly protected from disclosure or not, however, we believe the district court independently erred in allowing the Government to elicit testimony from Special Agent Adams as to the contents of the recording and to use it to impeach Brodie during cross-examination. It is well-settled that the Government cannot refuse to disclose discoverable statements of the defendant under Rule 16 and nevertheless "surprise" the defendant by using those same statements at trial. *E.g., United States v. Scafe*, 822 F.2d 928, 935–36 (10th Cir.1987); *United States v. Noe*, 821 F.2d 604, 607–08 (11th Cir.1987); *United States v. Bailleaux*, 685 F.2d 1105, 1113–14 (9th Cir.1982); *Caldwell*, 543 F.2d at 1352–53. Whether the Government uses the statements to establish its case-in-chief or to undermine the defendant's own testimony, the rule is the same: pre-trial disclosure to the defendant is a condition of the Government's usage. *See, e.g., Scafe*, 822 F.2d at 935–36 (impeachment); *Noe*, 821 F.2d at 607–08 (rebuttal).[3]

Without disputing this basic proposition, the Government responds that the defendant "opened the door" to the prosecution's use of the tape by conducting a "lengthy cross-examination of [Special Agent] Adams concerning the activities of the informant," but this is entirely unpersuasive. Defense counsel's cross-examination concerning DEA's use of an informant in no way implicated the existence of the surreptitious recording, much less its specific contents. The defendant had yet to present his entrapment defense, and this action on the part of the prosecutor potentially made more difficult Brodie's presentation of the defense later on. Indeed, because a jury would naturally be reluctant to disbelieve a Government witness' testimony concerning

---

**3.** A panel of the Second Circuit in *United States v. Johnson*, 525 F.2d 999, 1006 (2d Cir.1975), *cert. denied*, 424 U.S. 920, 96 S.Ct. 1127, 47 L.Ed.2d 327 (1976), concluded that use during cross-examination of information improperly withheld from the defendant under Rule 16 was presumptively unobjectionable. The court reasoned that "just as even a suppressed statement can be used on cross-examination to test the credibility of the defendant, *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), so may a statement improperly withheld from discovery, provided no prejudice has been shown...." 525 F.2d at 1006. We concur in *Johnson*'s focus on the degree of prejudice suffered by the defendant, but the Second Circuit's application of *Harris* strikes us as flawed. It is one thing, we think, to permit the Government to use a *suppressed* statement—which the *defendant* has prevented the Government from using—for purposes of impeachment, yet it is quite another to permit the Government to shield a statement from the defendant's knowledge (while promising not to use the statement) and subsequently allow the Government to ambush the defendant with that statement at trial.

the contents of a verbatim recording, Adams' remark may have attracted extra credit. The jury was reminded that the Government had a tape of the October 5 exchange between Brodie and the informant when the prosecutor displayed intimate familiarity with the recorded conversation in attempting, during cross-examination, to impeach Brodie's credibility. This was surely somewhat unfair. In any event, we do not accept the logic of the Government's position—we are not convinced that a defendant can ever be held to have opened the door to the use at trial of recorded statements that the Government has gone to great lengths to shield from the defendant's view. *Cf. United States v. Winston,* 447 F.2d 1236, 1240 (D.C.Cir. 1971) ("opening the door is one thing. But what comes through the door is another.").

The question that remains is whether Brodie has suffered prejudice warranting reversal of his conviction. Since defense counsel failed to lodge a contemporaneous objection, we conduct this inquiry under the "plain error" standard of FED.R.CRIM.P. 52(b). Under the circumstances, we believe Brodie's conviction survives this restrictive review; indeed, we doubt that Brodie has satisfied the less stringent standard of prejudice to substantial rights that would entitle him to reversal of his conviction even had he preserved the objection. To be sure, courts have occasionally found simple reversible (as opposed to plain) error in circumstances where the Government ambushed the defendant at trial with statements improperly concealed under Rule 16. *See Noe,* 821 F.2d at 607–08; *United States v. Lewis,* 511 F.2d 798, 801–02 (D.C.Cir.1975); *United States v. Pascual,* 606 F.2d 561, 565–66 (5th Cir.1979); *United States v. Padrone,* 406 F.2d 560, 561 (2d Cir.1969); *see also United States v. Rodriguez,* 799 F.2d

649, 654 (11th Cir.1986) (use of improperly withheld personal effects); *United States v. McElroy,* 697 F.2d 459, 465 (2d Cir.1982) (failure to disclose oral statements potentially relevant to admissibility of other statements the Government intended to use at trial).[4] Yet these cases, in which defense counsel preserved the error for appeal, have elements of unfairness not present in ours. In *Noe* and *Lewis,* for instance, the defendant had either been totally unaware of the existence of the recording in question or misled into believing the Government had no intention of using the material at trial; the Government's eventual use of the material amounted to "ambush." *See Noe,* 821 F.2d at 607–08; *Lewis,* 511 F.2d at 801. In *Lewis,* moreover, we were especially troubled that the Government had withheld the statement with the express intention of ambushing the defendant later on, an element not clearly evident here. *See Lewis,* 511 F.2d at 800–01.

Perhaps most important, when evaluated in context, the Government's surprise usage in each of those cases caused substantial damage to the core defense theory at trial. *See Noe,* 821 F.2d at 608 (alibi theory effectively rebutted); *Lewis,* 511 F.2d at 802–03 (agency theory rebutted). By contrast, in our case the Rule 16 violation was not substantially prejudicial to Brodie's theory. First, as suggested above, this was not a case where the defendant was duped into believing the recording did not exist. During the redirect examination of Special Agent Adams, Brodie became aware (if he were not aware earlier) that the Government both was knowledgeable regarding the statements he made to the informer on October 5, 1987 and was apparently prepared to use that knowledge at trial. As such, he was put on notice that his entrap-

---

4. More commonly, however, even where the defendant has preserved the objection for appeal, courts have declined to hold such Rule 16 violations prejudicial. *Scafe,* 822 F.2d at 936; *Bailleaux,* 685 F.2d at 1115–16; *United States v. Gleason,* 616 F.2d 2, 25 (2d Cir.1979), *cert. denied,* 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980); *Caldwell,* 543 F.2d at 1353; *United States v. Mitchell,* 613 F.2d 779, 781–82 (10th Cir.), *cert. denied,* 445 U.S. 919, 100 S.Ct. 1283,

63 L.Ed.2d 604 (1980); *United States v. Gladney,* 563 F.2d 491, 494–95 (1st Cir.1977); *United States v. Arcentales,* 532 F.2d 1046, 1050–51 (5th Cir.), *reh'g denied,* 540 F.2d 1086 (1976). Significantly, no court has found plain error in the circumstances we confront. *See United States v. Taylor,* 536 F.2d 1343, 1345 (10th Cir.), *cert. denied,* 429 U.S. 962, 97 S.Ct. 388, 50 L.Ed.2d 330 (1976); *Johnson,* 525 F.2d at 1005–06.

ment testimony would have to be consistent with Special Agent Adams' representation that the October 5 transcript contained no exhortative or threatening remarks by the informant. Brodie's later testimony was, in fact, consistent with this notion.[5] Paradoxically, that the jury was told of the existence and contents of the tape *prior* to Brodie's presentation of his defense actually mitigated the prejudicial effect of the error. We might have quite a different case if Brodie had been totally unaware of the Government's knowledge of the statement and, in reliance, had testified about specific threatening remarks on October 5, only to be subsequently impeached by the Government's testimony regarding the tape in rebuttal. Second, we think it is significant that Government counsel did not so much as even mention in closing argument either Special Agent Adams' remarks about the tape or Brodie's equivocation when confronted with the taped conversation during cross-examination. *See Bailleaux*, 685 F.2d at 1115 (finding prejudice mitigated by lack of Government emphasis on improperly-elicited evidence during closing argument). This is not to suggest the complete absence of prejudice to Brodie—he and his counsel were deprived of knowing precisely what the Government learned from the tape of the October 5 conversation, and thus were, at least theoretically, disadvantaged in preparing a defense to meet that knowledge.[6] But had the transcript been disclosed to Brodie prior to trial, thus assuring defense counsel of the absence of exculpatory remarks therein, it is difficult to imagine how Brodie's chosen defense would have been modified.

Of course, Brodie might have chosen to present a different defense altogether or opted for a disposition without trial. *See Lewis*, 511 F.2d at 802 ("a principal purpose of discovery is to advise defense counsel what the defendant faces in standing trial; it permits a more accurate evaluation of the factors to be weighed in considering a disposition of the charges without trial."); *see also Gladney*, 563 F.2d at 495 (same). Given the overwhelming evidence proffered by the Government on the substantive elements of the charged offenses, however, it is difficult to conceive of an alternative defense that Brodie could have pursued. The testimony adduced at trial certainly suggests nothing in the way of an alternative theory, and Brodie's entrapment defense, at least after the first two counts of the indictment were dropped, seemed terribly contrived apart from any illegitimate damage the Government's conduct may have done. As to the possibility of a plea, if Brodie were unwilling to accept disposition without trial at the outset, it seems unlikely that advance knowledge of the Government's ability to use the transcript at trial might have made him substantially more willing to bargain. In any event, mere speculation as to a possible shift in defense strategy or a plea bargain, alone, has ordinarily been held insufficient to establish simple prejudice, much less plain error. *See, e.g., United States v. Garmany*, 762 F.2d 929, 938 (11th Cir.1985), *cert. denied*, 474 U.S. 1062, 106 S.Ct. 811, 88 L.Ed.2d 785 (1986).

We in no way condone the Government's conduct in using the withheld tape (or transcript) to attempt to chip away at the defense theory at trial, conduct we believe was improper under Rule 16. Yet we are unable to find prejudice to Brodie's sub-

---

**5.** The additional damage that might have been done by the prosecutor's use of the transcript for impeachment purposes does not appear to have been influential. Our review of the record persuades us that Brodie's entrapment theory was in extreme jeopardy even apart from any unfair prosecution tactics. Testimony supplied in the Government's case-in-chief, together with statements elicited from Brodie during cross-examination, indicated that Brodie was extremely familiar with the "lingo" used by drug dealers and was aware of the extraordinary risk he was taking in dealing cocaine. Legitimate cross examination of Brodie produced glaring gaps and

inconsistencies in his story that he was acting simply as an agent of the informant during the course of the transactions.

**6.** Defense counsel failed to request a continuance after Adams' testimony was adduced, suggesting that any "ambush" that took place at trial was not plainly apparent to Brodie. *Cf. Caldwell*, 543 F.2d at 1353 (finding allegation of surprise belied by record in view of defense counsel's failure to request leave to inspect materials after their introduction by Government).

stantial rights on the record before us. *A fortiori*, we think a finding of plain error, which Brodie would have to establish to gain reversal of his conviction given counsel's procedural default, is unwarranted.

\*   \*   \*   \*   \*   \*

For the reasons stated, the judgment is *Affirmed.*